1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10  RUSH AIR SPORTS, LLC, a California Limited     No. 1:19-cv-00385-NONE-JLT
    Liability Company,
11                                                  ORDER GRANTING IN PART AND
                        Plaintiff,                  DENYING IN PART CROSS-
12                                                  DEFENDANTS' MOTIONS TO DISMISS
            v.                                      THE AMENDED COUNTER AND
13                                                  CROSS COMPLAINT; ORDER
    RDJ GROUP HOLDINGS, LLC, a Virginia             DENYING CROSS-DEFENDANTS'
14  Limited Liability Company; RALPH PARK, an       MOTION TO STRIKE AND MOTION
    individual; JEFF SHIRING, an individual;        FOR MORE DEFINITE STATEMENT
15  DAVID SILVERMAN, an individual; and DOES
    1–50, inclusive,                                (Doc. Nos. 41, 42, 43)
16
17                      Defendants.

18  _____

19  RDJ GROUP HOLDINGS, LLC, a Virginia
    Limited Liability Company; RALPH PARK, an
20  individual; JEFF SHIRING, an individual;
    DAVID SILVERMAN, an individual; FLIGHT
21  FIT N FUN (BAKERSFIELD) LLC, a Delaware
    Limited Liability Company,
22
23                      Cross-Complainants,

24          v.

25  RUSH AIR SPORTS, LLC; DAVID BYNUM, an
    individual; and ARCH ADAMS, an individual,
26
27                      Counter and Cross-
                        Defendants.
28

                                    1

**INTRODUCTION**

On October 2, 2019, the district judge previously assigned to this case granted in part and denied in part the motions to dismiss filed by Counter-Defendant Rush Air Sports, LLC ("Rush Air"), and Cross-Defendants David Bynum and Arch Adams (collectively "Cross-Defendants"). (Doc. No. 39.) Cross-Complainants RDJ Group Holdings, LLC ("RDJ"), Ralph Park, Jeff Shiring, David Silverman, and Flight Fit N Fun (Bakersfield) LLC ("Flight Fit N Fun") filed their First Amended Counter and Cross-Complaint on October 23, 2019 ("FACC"). (Doc. No. 40.) On November 13, 2019, Cross-Defendants filed a motion to dismiss the FACC. (Doc. No. 43.) Cross-Defendants additionally filed a motion to strike portions of the counter and cross-complaint and motion for more definite statement. (Doc. Nos. 41–42.)

The court has determined the motion to dismiss, motion for more definite statement, and motion to strike are suitable for decision based on the papers under Local Rule 230(g). For the reasons stated below, Cross-Defendants' motions to dismiss are GRANTED in part and DENIED in part with leave to amend granted. The motion for more definite statement and motion to strike are DENIED AS MOOT.

**FACTUAL BACKGROUND**

A.    **Negotiations for the Three Trampoline Parks**

In or around February or March 2017, Arch Adams approached RDJ and Flight Fit N Fun regarding the potential sale of three trampoline parks in Bakersfield, California ("Bakersfield Facility"); New Jersey ("New Jersey Facility"); and New York ("New York Facility") (collectively, the "Three Facilities"), all owned and operated by corporate entities in which Adams had an ownership interest. (FACC ¶ 11.) Adams is regarded as "an experienced and well-known trampoline expert, trampoline/family entertainment industry insider and businessman." (*Id.* ¶ 12.) Adams and his trampoline manufacturing business, Fun Spot, "had and have many customers which include competitors of RDJ and Flight Fit N Fun whom Adams and Fun Spot know well and have had long-standing relationships." (*Id.* ¶ 13.) RDJ learned that Adams sought to divest his US Holdings, which coincided with RDJ's plan to expand its operations in the Northeast and in California. (*Id.* ¶ 14.) Thus, RDJ and Flight Fit N Fun engaged in discussions with Adams regarding the purchase of the Three Facilities. (*Id.*) Adams was part-owner of each of the companies that owned the Three Facilities. (*Id.*)

Cross-Defendant Rush Air owned a trampoline park in Bakersfield, California. (*Id.* ¶ 15.) Adams owned a membership interest in Rush Air as manager of Waylaid, LLC. (*Id.*) Cross-Defendant Bynum was the manager of Rush Air. (*Id.* ¶ 17.) Bynum served as legal counsel to Rush Air and its members in connection with the sale of the Bakersfield Facility. (*Id.* ¶ 18.) "[U]pon information and belief, [Bynum] served as counsel for the owners selling the New York Facility and New Jersey Facility." (*Id.*)

On or around October 18, 2017, "Rush Air and its members, including Adams and Bynum, jointly signed and entered into an Asset Purchase Agreement (the 'Bakersfield APA') with the Buying Parties." (*Id.* ¶ 19.) Simultaneously, "RDJ through its respective subsidiaries and affiliates was also engaged in discussions with the sellers of the New York Facility and New Jersey Facility." (*Id.* ¶ 20.) Adams was the principal of each seller. (*Id.*)

According to the FACC, Adams marketed and solicited the sale of the Three Facilities as a "bundled" transaction. (*Id.* ¶ 21.) Based on Adams' "vast experience" in the trampoline park industry, Adams was the "main attraction" common to all Three Facilities in which RDJ was interested, "and all parties in the transactions involving the Three Facilities knew that RDJ and its respective subsidiaries and affiliates were buying the Three Facilities because of Adams as a 'bundle' for an agreed-upon common denominator of a multiple of each Facility's Earnings Before Interest, Tax, Depreciation and Amortization ('EBITDA')." (*Id.* ¶ 22.) The same multiple of EBITDA was agreed upon for the Three Facilities. (*Id.* ¶ 23.)

"The common denominator (i.e., multiplier) to be used for the Three Facilities as a 'bundled' acquisition was determined based upon the disclosures to RDJ and Cross-Plaintiffs that Adams and Bynum made, both individually and on behalf of Rush Air, relating to all Three Facilities' performances, both past performances and expected future performances." (*Id.* ¶ 24.) "It was the parties' intent that the disclosures relating to both the New Jersey and New York facilities were also disclosures relating under the Bakersfield APA and were necessary and relevant to the parties' determination of the common denominator." (*Id.*) "Accordingly, any misrepresentations or omission by Adams, Bynum, and Rush Air as to the New Jersey or New York facilities were also misrepresentations and omissions under the Bakersfield APA and had a direct impact on the calculation

of the denominator to be used for the acquisition of the Bakersfield Facility."  (*Id.*)

The RDJ subsidiaries and affiliates entered into three nearly-identical Asset Purchase Agreements on the same date—October 18, 2017—to purchase and acquire the Three Facilities.  (*Id.* ¶ 25.)  Cross-Defendants Rush Air, Bynum, and Adams, and "their various and respective selling entities and affiliates, including Plaintiff Rush Air, made various material and critical warranties and representations which were extremely significant to RDJ and its affiliates (and to RDJ's principals Park, Shiring and Silverman) and upon which said parties relied upon in acquiring the Three Facilities."  (*Id.* ¶ 26.)

B.    **Competing Trampoline Parks Open in New Jersey**

Approximately a week before RDJ and its affiliates closed on the deal for the Three Facilities, a new competitor, Altitude Trampoline Park ("Altitude"), opened a trampoline park nearly 11 miles from the New Jersey Facility unbeknownst to RDJ, its affiliates, and Cross-Complainants.  (*Id.* ¶ 35.)  Approximately two to three weeks after closing, another competitor, Urban Air Trampoline and Adventure Park ("Urban Air"), opened a trampoline park approximately 13 miles from the New Jersey Facility.  (*Id.* ¶ 36.)

"As part of the due diligence process related to the acquisition of the Three Facilities, Rush Air, Bynum, and Adams were asked to disclose any new competitor properties being built or existing ones being refurbished or expanded within 25 miles of any of the Three Facilities."  (*Id.* ¶ 37.)  In summer 2017, "Rush Air, Bynum, and Adams affirmatively stated in writing that they 'were not aware of any new competitor or refurbishments at this time' that would be within 25 miles from either the New York or New Jersey Facilities."  (*Id.*)  In summer 2017, however, Adams, through his affiliated company Fun Spot, entered into an agreement with Altitude to design and outfit Altitude's facility with trampolines, platforms, climbing walls, and foam pits by July 2017—three months *before* the parties entered into the Bakersfield, New Jersey, and New York APAs.  (*See id.* ¶ 39; FACC, Ex. A at 2 (Doc. No. 40-1) ("Bakersfield APA"); FACC, Ex. B at 2 (Doc. No. 40-2) ("New Jersey APA"); FACC, Ex. C at 2 (Doc. No. 40-3) ("New York APA").)  Adams's contract with Altitude "was never disclosed during the parties' due diligence and/or negotiation of the common denominator that was to be used for all Three Facilities."  (FACC ¶ 39.)

Rush Air, Bynum, and Adams were also aware of the pending opening of Urban Air as early as April 2017. (*Id.* ¶ 40.) Ari Moses, the owner of Urban Air, contacted Adams and Fun Spot in March or April 2017 as a potential trampoline vendor for the upcoming Urban Air facility. (*Id.*) Despite being almost 13 miles away from the New Jersey Facility, Rush Air, Bynum, and Adams did not disclose the Urban Air facility before the sale of the Three Facilities closed in October 2017. (*Id.*)

Cross-Complainants allege "[t]his disclosure was important as the New Jersey Facility was the biggest facility of the Three Facilities and was the driving force behind what RDJ and the [Cross-Complainants] would be willing to use as a denominator of EBIDTA for the purchase price of the Three Facilities." (*Id.* ¶ 37.) Therefore, "any new competitor to the New Jersey Facility would have an impact on its financial performance and calculation of the EBITDA multiplier for the Three Facilities." (*Id.*) "Rush Air, Bynum, and Adams knew that the New Jersey Facility, and its expected future performance, was integral to the acquisition of the Three Facilities as a bundled transaction and that without the New Jersey Facility, RDJ and [Cross-Complainants] would not be willing to acquire the New York or Bakersfield Facilities, or they would have purchased them at a much lower EBITDA multiplier." (*Id.* ¶ 38.)

Competition in the trampoline and multi-attraction family entertainment industry is allegedly fierce. (*Id.* ¶ 41.) Unexpected competitors have a significant impact on the value and viability of an ongoing facility. (*Id.*) New or existing competitors near a facility and the number of competitors are material and significant factors in determining acquisition value and the fair and reasonable EBITDA of existing facilities. (*Id.*)

Cross-Complainants allege, "[t]he operations of these competitors have had a 'Materially Adverse Effect' on the financial condition, assets, business, and results of the New Jersey Facility." (*Id.* ¶ 42.) Moreover, "the unexpected presence of these competitors (and their active and aggressive competition) 'has affected the historical operation' of the New Jersey Facility and will 'adversely affect' in the future 'all or any portion' of the business of the New Jersey Facility so that the New Jersey facility will not be able to perform 'in a manner consistent with its historical practices and performance.'" (*Id.* ¶ 43.)

/////

Cross-Complainants allege that Rush Air, Bynum, and Adams intentionally failed to disclose the Altitude and Urban Air facilities in summer 2017 to ensure that the Three Facilities were acquired as a bundled transaction and that they could negotiate the highest common denominator for the Bakersfield Facility due to an inflated EBITDA for the New Jersey Facility. (*Id.* ¶ 44.) Cross-Complainants contend they would never have entered into the APAs if they knew that two competitors would open near the New Jersey Facility before and shortly after closing on the Three Facilities. (*Id.* ¶ 45.) "At best, RDJ and its affiliates would have paid a much lesser EBITDA multiple for the Three Facilities." (*Id.*)

C.     **The Bakersfield Asset Purchase Agreement**

1.     Required Disclosures

Article 3 of the Bakersfield APA provides that "Seller and the Members, jointly and severally" made all warranties and representations therein. (*See* FACC ¶ 29 (citing Bakersfield APA at 13).) Cross-Complainants allege that under Section 3.6(a)(vii) of the Bakersfield APA, Rush, Bynum, and Adams were required to disclose any "Contract with any Related Party relating to or in any way affecting the Business." (*Id.* ¶ 27.) Specifically, Section 3.6(a)(vii) of the Bakersfield APA provides that "Schedule 3.6(a) sets forth a true, complete and correct list of all of the following Contracts[1] to which Seller is a party or by which its assets and properties are bound," including "any Contract with any Related Party relating to or in any way affecting the Business." (Bakersfield APA § 3.6(a)(vii).)

Under the Bakersfield APA, the "Seller" is defined as "Rush Air Sports, LLC, a California limited liability company. (*See* Bakersfield APA at 6, 68.) The "Related Parties" are defined as "(a) any of [Seller's] Affiliates or Employees or (b) the Members, their family members or any of their Affiliates." (*See id.* § 3.20; *id.* at 29, 67.) "'Affiliate' shall mean, with respect to any Person, any other

---

[1]  Under the Bakersfield APA, "'Contracts' shall mean all contracts, leases, arrangements, indentures, notes, bonds, mortgages, guarantees, loans, instruments, commitments or other agreements . . . written or oral (including any amendments, supplements, restatements, extensions and other modifications thereto), of Seller, to which Seller is a party or by which Seller, the Purchased Assets, or Seller's assets or properties are bound and that are in effect as of the date of this Agreement." Bakersfield APA, Annex A at 61 (Doc. No. 40-1).

Person directly or indirectly controlling, controlled by, or under common Control[2] with such Person." (Bakersfield APA, Annex A at 60.) "Business" means "Rush Air Sports." (*See* Bakersfield APA at 6; *id.*, Annex A at 60.)

Section 3.20 of the Bakersfield APA provides that "Schedule 3.20 sets forth a true, correct and complete list of all Contracts and arrangements between or among Seller, on the one hand, and [the Related Parties], on the other hand." (Bakersfield APA § 3.20.[3]) Cross-Complainants allege:

> Section 3.20 of the Bakersfield APA also requires Rush Air, Bynum, and
> Adams to disclose whether any "Related Party (i) has been involved in any
> business agreement, arrangement or relationship with, relating to or in any
> way affecting Seller or the Business (including furnishing services to or
> receiving services from, renting or leasing equipment, real estate or other
> assets or properties to or from, or providing or receiving the benefit of
> properties or assets from non-arm's length compensation) within the past
> three (3) years."

(FACC ¶ 28.)

### 2. Conditions Precedent

Article 6.3(c) of the Bakersfield APA's Conditions Precedent section states the "obligation of [the Selling Parties] to consummate the transactions to be performed by it at the Closing is subject to the satisfaction . . . of each of the following conditions prior to or at the Closing date . . ." including "[t]he simultaneous closing of the purchase of assets by RDJ . . . and their Affiliates from Air Plus Trampoline Sports, Inc. [for the New Jersey Facility] and Current Holdings Group, Inc. [for the New York Facility]." (Bakersfield APA § 6.3.)

### 3. Integration Clause/Guaranty

The Bakersfield APA contained an integration clause. Bakersfield APA § 8.1. Rush Air and its members also agreed to indemnify the Buyer Group. (*Id.* § 7.2(a)–(b).) Section 7.2 of the Bakersfield

---

[2] "Control," "controlled by," "controlling," and "under common control with" means "possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise." Bakersfield APA, Annex A at 62.

[3] The court has been unable to locate Schedules 3.6 and 3.20 in the exhibits to the FACC. Nonetheless, at this stage of the litigation, the court is required to accept the pleadings as true and resolve all inferences in the nonmoving party's favor. *Lazy Y. Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

APA states:

> 7.2 <u>Indemnification by Seller and the Members</u>. Seller and the Members agree to defend, indemnify, and hold harmless, jointly and severally, the Buyer Parties and each of their Affiliates (collectively, the "Buyer Group") (and, to the extent that Seller and the Members are required to . . . indemnify . . . with respect to Losses hereinafter described, their respective officers, directors, managers, members, employees, agents, advisors, representatives, successors and assigns) (each hereinafter referred to individually as a "Buyer Indemnified Person" and collectively as "Buyer Indemnified Persons"), . . . in respect of all Losses resulting from, arising out of, relating to, or caused by . . . (a) any breach of any representation or warranty made by Seller or the Members herein (without taking into account any "knowledge" or "material adverse effect" qualification or other "materiality" qualifications) . . . [or] (b) any breach by Seller of, or failure by Seller to perform, . . . or otherwise fulfill or comply with, any of the covenants, agreements, undertakings or obligations contained in this Agreement.

(*Id.* § 7.2(a)–(b) (emphasis omitted).)  As part of the Bakersfield APA, Park, Shiring, and Silverman signed as Guarantors from RDJ in favor of Rush Air.  (Doc. No. 2-1 at 12–18.)  Bynum signed the Guaranty as the guaranteed party on behalf of Rush Air Sports.  (Doc. No. 2-1 at 18.)  The Bakersfield APA defines "Contracts" to include guarantees.  Bakersfield APA, Annex 1 at 61 ("'Contracts' shall mean all contracts, leases, arrangements, . . . . guarantees . . . commitments or other agreements . . . of Seller") (emphasis omitted).

The Bakersfield APA established that California law governed the interpretation, construction, and enforcement of the Bakersfield APA.  (*Id.* § 8.9(a).)  The Bakersfield APA also established that any action involving any equitable or other claim arising out of the Bakersfield APA would be subject to suit in the United States District court for the Eastern District of California or the state courts of California.  (*Id.* § 8.10.)

D.     **Procedural History and the FACC**

On February 6, 2019, Plaintiff Rush Air filed a complaint in the Kern County Superior Court against Defendants RDJ Group, Ralph Park, Jeff Shiring, David Silverman, and Does 1–50.  (Doc. No. 2-1 at 3.)  On March 25, 2019, Defendants removed the instant action to this federal court.  (Doc. No. 2.)  On April 26, 2019, RDJ Group, Park, Shiring, Silverman, and Flight Fit N Fun filed a counter and cross-complaint against Rush Air, David Bynum, and Arch Adams.  (Doc. No. 7.)  On June 12, 2019,

Cross-Defendants filed three motions to dismiss, a motion for a more definite statement, and motion to strike Cross-Complainants' counter and cross-complaint. (Doc. Nos. 12–16.) On October 3, 2019, the court granted in part and denied in part Cross-Defendants' motions to dismiss. (Doc. No. 39 at 27–28.) The court denied the remaining motions as having been rendered moot. (*Id.*) On October 23, 2019, Cross-Complainants filed their FACC. (Doc. No. 40.)

Cross-Complainants assert the following claims against Cross-Defendants:

1. Count One: Breach of Contract for breach of the Bakersfield APA and breach of the Non-Competition and Non-Disclosure Agreements as part of the Bakersfield APA against Rush Air, Bynum, and Adams;

2. Count Two: Unjust Enrichment against Rush Air, Bynum, and Adams;

3. Count Three: Breach of the Implied Covenant of Good Faith and Fair Dealing against Rush Air, Bynum, and Adams;

4. Count Four: Fraudulent Inducement against "Selling Parties[4], particularly including but not limited to Bynum and Adams" (Doc. No. 40 ¶ 69); and

5. Count Five: Declaratory Judgment against Rush Air.

E. **The Motion to Dismiss**

All Cross-Defendants move to dismiss the FACC under Federal Rule of Civil Procedure 12(b)(3) for improper venue due to the parties' forum selection clause. (Doc. No. 43-1 at 13–15.) Arch Adams seeks to dismiss the FACC under Rule 12(b)(6) for the breach of contract and breach of the covenant of good faith and fair dealing claims. (Doc. No. 43-1 at 6, 16–17.) All Cross-Defendants seek to dismiss the unjust enrichment and fraud claims under Rule 12(b)(6). (*Id.* at 6, 13–14.) Lastly, Rush Air moves to dismiss the declaratory relief claim. (*Id.* at 20–21.)

/////

/////

/////

/////

---

[4] Cross-Complainants define "Selling Parties" as Rush Air, Bynum, and Adams. (Doc. No. 40 ¶ 29.)

**DISCUSSION**

A.    **Motion to Dismiss for Improper Venue**

Cross-Defendants seek dismissal of the entire FACC under Rule 12(b)(3) for improper venue based on the parties' forum selection clause.[5]  (Doc. No. 43-1 at 13–15.)  An analysis under Rule 12(b)(3) allows district courts to consider facts outside of the pleadings.  *See Argueta v. Banco Mexicano S.A.*, 87 F.3d 320, 324 (9th Cir. 1996).  Nonetheless, the court must draw all reasonable inferences and resolve all factual conflicts in favor of the non-moving party.  *See Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138 (9th Cir. 2004).

Federal law governs the enforceability of a forum selection clause.  *See Argueta*, 87 F.3d at 324. If a court determines that venue is improper, it may dismiss the case, or, if the interests of justice require, the court may transfer the case to any district in which it properly could have been brought.  28 U.S.C. § 1406(a).  The court has discretion on the decision to transfer.  28 U.S.C. § 1404(b); *King v. Russell*, 963 F.2d 1301, 1304 (9th Cir. 1992).

1.    Which APA Controls: New Jersey or California?

Here, the contracts contain forum selection clauses, which designate California, New Jersey, and New York state and federal courts for litigation arising out of each of those contracts, respectively. Cross-Defendants assert the New Jersey APA's forum selection clause controls. (*See* Doc. No. 43-1 at 14.)  In contrast, Cross-Complainants argue the Bakersfield APA applies because the FACC claims arise from the Bakersfield APA.  (Doc. No. 47 at 16–18.)

Cross-Defendants argue that Cross-Complainants have not cited to any provision in the Bakersfield APA that would give rise to a breach of contract claim for the opening of competing parks in New Jersey.  (Doc. No. 52 at 3.)  Cross-Defendants contend that Cross-Complainants' framing of the acquisitions as a "Bundled Transaction" does not change the fact that the three APAs were separate, fully integrated documents, requiring three separate forums for their disputes.  (*See* Doc. No. 52 at 3.) Cross-Defendants further assert that Section 3.20 of the Bakersfield APA is insufficient because Cross-

---

[5]  Cross-Defendants appear to have inadvertently relied upon Rule 12(b)(1) as the basis for its motion to dismiss despite acknowledging that such a motion to dismiss is properly brought under Rule 12(b)(3) and pursuant to this court's prior order.  (*See* Doc. No. 39 at 14–15; Doc. No. 43-1 at 13–15.)

Complainants have failed to show that the opening of the competing New Jersey facilities affects Rush Air Sports. (*See id.*)

In its prior Order addressing Cross-Defendants' motions to dismiss for improper venue, the court concluded that the New Jersey APA applied because Cross-Complainants did not cite any provision in the Bakersfield APA that would give rise to contract claims stemming from the New Jersey events. (Doc. No. 39 at 16–17.) The court finds that the FACC cures the defects which originally failed to link the New Jersey events to the Bakersfield APA. Cross-Complainants highlight Sections 3.6 and 3.20 of the Bakersfield APA. In Section 3.6(a), the Seller, Rush Air, represented that it provided a "true, complete and correct list" of Contracts to which Seller [wa]s a party," including "any Contract with any Related Party relating to or in any way affecting the Business." (Bakersfield APA § 3.6(a)(vii).) Section 3.20 provides that Seller and "any of its Affiliates," or "the Members, their family members or any of their Affiliates (collectively, 'Related Parties') represent that they provided a "true, correct and complete list of all Contracts and arrangements." (*Id.* § 3.20.) The Related Parties further represented that "no Related Party (i) has been involved in any business agreement, arrangement or relationship with, relating to or in any way affecting Seller or the Business . . .." (*Id.*)

Cross-Complainants allege that the acquisition of the Bakersfield Facility was part of a bundled transaction with the New Jersey and New York Facilities, and any disclosures or omissions related to any one of the facilities was a disclosure or omission to the other facilities. (*See* Doc. No. 47 at 16.) In other words, an omission regarding the financial prospects of one facility—especially the New Jersey Facility since it is the biggest trampoline park of the Three Facilities—affects the parties' agreed upon EBITDA multiplier for all Three Facilities. (*See* FACC ¶ 37.)

Indeed, this common multiplier was based on Adams' and Bynum's disclosures to Cross-Complainants, individually and on Rush Air's behalf, concerning all Three Facilities' past performances and expected future performances. (Doc. No. 47 at 16.) During due diligence, Cross-Defendants were asked to disclose any new competitor properties within 25 miles of the Three Facilities. (*Id.* at 17) (citing FACC ¶ 37). In summer 2017, Cross-Defendants stated in writing they "[w]ere not aware of any new competitor or refurbishments at this time" that would be within 25 miles from the New Jersey or New York facilities. (*Id.*) However, as early as March or April 2017, Urban

Air contacted Adams as a potential trampoline vendor for its upcoming Urban Air Facility—which was approximately 13 miles from the New Jersey Facility.  (FACC ¶ 40.)  In the summer of 2017, Adams and his company, Fun Spot, contracted with Altitude to design and outfit Altitude's Facility—which was approximately 11 miles from the New Jersey Facility.  (FACC ¶¶ 35, 37.)  The FACC alleges that Cross-Defendants failed to disclose Adam's relationship with Altitude in July 2017—which was three months before the parties closed on the Three Facilities.  (*See* FACC ¶ 39.)  Thus, an "inflated financial performance for the New Jersey Facility led to an inflated (and misrepresented) multiplier for all three facilities and an overpayment for the Bakersfield Facility."  (*Id.*)

Further, Section 6.3(c) of the Bakersfield APA established as a condition precedent the "simultaneous closing of the purchase of assets by RDJ . . . and their Affiliates from Air Plus Trampoline Sports, Inc. [for the New Jersey Facility] and Current Holdings Group, Inc. [for the New York Facility]."  (Bakersfield APA § 6.3.)

In sum, Cross-Complainants sufficiently allege a link between the opening of competing parks in New Jersey and Bakersfield APA Sections 3.6(a) and 3.20's requirements for the Related Parties to disclose any Contracts affecting the Business.  Adams's agreement to design the Altitude Facility and his purported knowledge regarding the opening of the Urban Air Facility support the allegation that the inflated EBIDTA multiplier concerning the New Jersey Facility—the "driving force" behind the transactions as the largest facility—affected the Bakersfield and New York Facilities' common denominators.  Moreover, the Bakersfield APA required the simultaneous closing of the Three Facilities.  Therefore, there is a sufficient nexus between the opening of the New Jersey competitors and the Bakersfield APA such that the Bakersfield APA's forum selection clause applies.

2.  Enforceability of the Forum Selection Clause

Neither party has addressed the validity of the Bakersfield APA's forum selection clause.  "A forum selection clause is presumptively valid; the party seeking to avoid a forum selection clause bears a 'heavy burden' to establish a ground" on which a forum selection clause should not be enforced.  *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1083 (9th Cir. 2009).  There are three circumstances under which enforcement of a forum selection clause would be unreasonable:

/////

12

> (1) if the inclusion of the clause in the agreement was the product of fraud or overreaching; (2) if the party wishing to repudiate the clause would effectively be deprived of his day in court were the clause enforced; and (3) if enforcement would contravene a strong public policy of the forum in which suit is brought.

*Murphy*, 362 F.3d at 1140 (internal citations and quotation marks omitted). Forum selection clauses are also scrutinized for "fundamental fairness," and may be deemed unfair if inclusion of the clause was motivated by bad faith, or if the party had no notice of the forum provision. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991). "The party challenging the clause bears a 'heavy burden of proof.'" *Murphy*, 362 F.3d at 1140 (quoting *Bremen v. Zapata Off–Shore Co.*, 47 U.S. 1, 17, (1972)).

a. *Fraud or Overreaching*

Nothing in the parties' filings demonstrate that the forum selection clauses designating California, New Jersey, and New York as the proper forums to litigate claims arising from those states, respectively, were products of fraud or overreaching. While other allegations of fraud appear in the cross-complaint, none relate to negotiations over provisions in the three contracts. As such, consideration of this factor weighs in favor of enforcing the Bakersfield APA forum selection clause.

b. *Deprivation of Cross-Complainants' Day in court*

Neither party argues that enforcement of the Bakersfield APA's forum selection clause would deprive them of their day in court. Thus, the court will turn to an examination of the next factor.

c. *Contravention of Strong Public Policy*

The court sees no strong public policy that would be implicated if it enforces the Bakersfield APA's forum selection clause. Based on the parties' filings, there appears to have been sophisticated parties on both sides of the negotiation at issue. Adams is purported to be a trampoline industry insider, Cross-Complainants already operated trampoline parks on the East Coast, and the remaining Cross-Defendants were involved in the trampoline park and family entertainment business. Enforcing the Bakersfield APA forum selection clause would not contravene strong public policy principles.

The court therefore finds that the Bakersfield APA's forum selection clause designating this court as the proper venue for disputes is enforceable. Accordingly, Cross-Defendants' motion to dismiss under Rule 12(b)(3) will be DENIED.

B.     **Motion to Dismiss for Failure to State a Claim**

A motion to dismiss pursuant to Rule 12(b)(6) is a challenge to the sufficiency of the allegations set forth in the complaint. Dismissal under Rule 12(b)(6) is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the allegations in the complaint, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD*, 546 F.3d at 588.

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 555 (internal citations omitted). Thus, "bare assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements'. . . are not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. "[T]o be entitled to the presumption of truth, allegations in a complaint . . . must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. To the extent that a deficient pleading can be cured by the allegation of additional facts, however, a plaintiff should be afforded leave to amend. *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

/////

/////

1.     <u>Adams's Motion to Dismiss</u>

Adams moves to dismiss the breach of contract and breach of the covenant of good faith and fair dealing claims because he was not a party to the Bakersfield APA. (Doc. No. 43-1 at 13.) Adams contends that his only involvement in the Bakersfield APA was signing as manager of Waylaid, which is a member of Rush Air. (*Id.*) Adams argues he cannot be found personally liable for Waylaid's debts or obligations under California law. (*Id.*) (citing Cal. Corp. Code § 17703).[6]

As Cross-Complainants highlight, this court previously held that Adams was subject to its personal jurisdiction given his alleged involvement with the Three Facilities transactions. (Doc. No. 39 at 12–13.) However, a finding that a party is subject to the court's personal jurisdiction is not dispositive of the issue raised in Adams's motion—whether Adams, who signed the Bakersfield APA on Waylaid's behalf, can be held personally liable for breach of contract or breach of the implied covenant of good faith and fair dealing. The court notes that the parties have failed to cite any case law in support of their arguments on this issue.

a.     *Breach of Contract.*

Neither party disputes that the Bakersfield APA is a valid contract. Generally, only a party to a contract can breach it. *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002). Typically, members of a California limited liability company cannot be personally liable on a contract signed on behalf of the limited liability company. Cal. Corp. Code § 17703.04(a)(2) ("debts, obligations, or other liabilities of a limited liability company, whether arising in contract, tort, or otherwise . . . do not become the debts, obligations, or other liabilities of a member or manager *solely by reason of the member acting as a member or manager acting as a manager* for the limited liability company.") (emphasis added).[7] Limited liability company members "may not be held liable for the wrongful conduct of the companies *merely* because of the managers' status, they may nonetheless be held accountable under [the predecessor Corporations Code] for their personal participation in tortious or criminal conduct, even when performing their duties as manager." *People v. Pacific Landmark, LLC*, 129 Cal. App. 4th 1203,

---

[6] California Corporations Code § 17703 was repealed in 1999.

[7] Because California Corporations Code § 17703 has been repealed, the court analyzes § 17703.04 for guidance.

1212 (2005) (emphasis in original); Cal. Corp. Code § 17703.04(b). "[T]he privilege against personal liability is not absolute." *Comercializadora Recmaq v. Hollywood Auto Mall, LLC*, No. 12-cv-0945-AJB (MDD), 2014 WL 3628272, *7 (S.D. Cal. July 21, 2014) (citing *Pac. Landmark*, 129 Cal. App. 4th at 1212). "Fraud in the inducement is a subset of the tort of fraud." *Hinesley v. Oakshade Town Ctr.*, 135 Cal. App. 4th 289, 294 (2005).

Here, Cross-Complainants allege fraudulent inducement, discussed more fully in Section B.3. of this Order. Cross-Complainants outline Adams's allegedly tortious conduct as follows: Adams acted in his own interest—not on Waylaid's behalf—when he personally approached Cross-Complainants in March 2017 with the proposed bundled transaction (Doc. No. 47 at 19); "Adams marketed and solicited the sale of the Three Facilities as a 'bundled' transaction." (*id.* at 23); "all parties in the transactions . . . were buying the Three Facilities because of . . . Adams as a 'bundle.'" (*id.*); Adams's had ownership rights in each of the Three Facilities (*id.* at 19); the common multiplier for the Three Facilities was based upon Adams's disclosures (*see id.* at 23); Adams contracted with Altitude to design and outfit Altitude's facility in summer 2017 (*id.* at 24); Urban Air's manager contacted Adams in April 2017 for potential trampoline services (*id.*); during the parties' due diligence in summer 2017, Adams stated in writing that he was not aware of new competitors that would be within 25 miles of the New Jersey facility (*id.*); Altitude opened its facility a week before the parties closed on the sale of the Three Facilities (*id.*); and Urban Air opened two-to-three weeks after the parties closed on the sale of the Three Facilities (*id.*).

Cross-Complainants argue they "engaged with Adams, not his various companies, to purchase the Three Facilities" because "Adams was the 'main attraction' or factor to [Cross-Complainants], common to all of the Three Facilities." (*Id.* at 19) (citing FACC ¶ 22). Cross-Complainants assert that Adams "knew of certain facts that were critical to the purchase of the Three Facilities as a bundled transaction for the agreed upon multiplier," but "as one of the selling parties of the Three Facilities, 'intentionally concealed these facts from [Cross-Complainants] to induce [Cross-Complainants] to enter into the APAs for the Three Facilities, including the Bakersfield APA.'" (*Id.*) (citing FACC ¶¶ 26, 76–77).

/////

Cross-Complainants have sufficiently alleged that Adams engaged in tortious conduct to invoke personal liability under California Corporation Code § 17703.04. Accordingly, Adams's motion to dismiss the breach of contract claim will be DENIED.

### b. *Good Faith and Fair Dealing*

"Breach of the covenant of good faith and fair dealing is nothing more than a cause of action for breach of contract." *Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga*, 175 Cal. App. 4th 1306, 1344 (2009). "There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 400 (2000). The implied covenant is "as much a part of the instrument as if [the covenant] were written out." *Comunale v. Traders & General Ins. Co.*, 50 Cal. 2d 654, 662 (1958). The claim of the implied covenant of good faith and fair dealing also survives if there are allegations of "bad faith on the part of the accused." *See Sam Kohli Enters., Inc. v. BOC Grp., Inc.*, No. 11-cv-299, 2011 WL 3298902, *5 (S.D. Cal. Aug. 1, 2011).

For the same reasons applicable to Adams's motion to dismiss the breach of contract claim, the court finds that Cross-Complainants sufficiently allege Adams's bad faith conduct. Adams's motion to dismiss the breach of the implied covenant of good faith and fair dealing claim will therefore likewise be DENIED.

### 2. Unjust Enrichment

Cross-Complainants' second cause of action is for "unjust enrichment," which Cross-Defendants urge the court to dismiss as inconsistent with Cross-Complainants' allegations of an express contract. (*See* Doc. No. 43-1 at 17–18.) As this court stated in its October 3, 2019, order, Cross-Complainants' two claims are mutually exclusive for purposes of judgment and awarding damages: "[A]n action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contracting covering the same subject matter." (Doc. No. 39 at 26–27 (quoting *Lance Camper Mfg. Corp. v. Republic Indem. Co.*, 44 Cal. App. 4th 194, 203 (1996)).) "Restitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason." *McBride v.*

*Boughton*, 123 Cal. App. 4th 379, 388 (2004). The two claims may be pled simultaneously as alternatives, but a plaintiff must be precise in pleading these alternative claims. *Compare, e.g.*, *Gerlinger v. Amazon.Com, Inc.*, 311 F. Supp. 2d 838, 856 (N.D. Cal. 2004) (a quasi-contract claim incorporating by reference an allegation of an express agreement defeats the quasi-contract claim), *with Ball v. Johanns*, No. 07-cv-1190-LKK-DAD, 2008 WL 269069, *3 (E.D. Cal. Jan. 29, 2008) (unjust enrichment claim not barred despite simultaneous claim for breach of contract).

Once again, in pleading their quasi-contract claim, Cross-Complainants incorporate by reference all previous allegations which include the allegation of an express, enforceable agreement between the parties; this is fatal to the quasi-contract claim. (Doc. No. 40 ¶ 64.) The facts pled to maintain the alternative claim must support that alternative. This is a very simple and technical pleading defect and should presumably not be difficult to cure. Cross-Complainants' alternative claim for unjust enrichment—which is really a quasi-contract claim for restitution—will be DISMISSED with leave to amend. Cross-Complainants are warned that if they fail to carefully consider and abide by the court's instructions in this regard, this claim will be dismissed without further leave and imposition of sanctions may be considered.

### 3. Fraudulent Inducement

Under California law, the elements of fraud are: "[1] misrepresentation (false representation, concealment, or nondisclosure); [2] knowledge of the falsity (or 'scienter'); [3] intent to defraud, i.e., to induce reliance; [4] justifiable reliance; and [5] resulting damage." *Lazar v. Super. Ct.*, 12 Cal. 4th 631, 638 (1996). Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting [the] fraud[.]" Fed. R. Civ. P. 9(b). The party must set forth in detail "the who, what, when, where, and how" of the alleged fraudulent conduct. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation omitted).

"Fraud in the inducement is a subset of the tort of fraud. It occurs when the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present and a contract is formed, which by reason of the fraud, is voidable." *Hinesley*, 130 Cal. App. 4th at 294 (internal citations and quotation marks omitted).

/////

Cross-Defendants move to dismiss the fraud claim because it does not state with particularity "when" the alleged fraudulent conduct occurred "or state the other details." (Doc. No. 43-1 at 19.) Cross-Defendants further argue the Bakersfield APA does not contain any disclosure requirements relating to New Jersey and that "Buying Parties" is limited to RDJ and Flight Fit N Fun. [8] (*Id.*)

First, Cross-Complainants allege that during the parties' due diligence for the Three Facilities, Rush Air, Bynum, and Adams were asked to disclose any new competitor properties being built or existing ones being refurbished or expanded within 25 miles of any of the Three Facilities. (*See* Doc. No. 47 at 23) (citing FACC ¶ 27). In summer 2017, "Rush Air, Bynum, and Adams affirmatively stated in writing that they 'were not aware of any new competitor or refurbishments at this time' that would be within 25 miles from either the New York or New Jersey Facilities." (*Id.* at 24) (quoting FACC ¶ 37). However, Cross-Complainants allege that Rush Air, Bynum, and Adams knew about Altitude's pending opening because Adams's company, Fun Spot, entered into an agreement with Altitude to design and outfit the Altitude facility by July 2017—three months *before* the parties entered into the Bakersfield APA. (*See id.*) (citing FACC ¶ 39). Additionally, Cross-Complainants allege Urban Air's owner contacted Adams and Fun Spot in March or April 2017 "as a potential trampoline vendor for the upcoming Urban Air Facility." (*Id.*) (quoting FACC ¶ 40). Unbeknownst to Cross-Complainants, Altitude opened its facility roughly 11 miles from the New Jersey Facility approximately a week before the parties closed on the APAs for the Three Facilities. (*Id.*) (citing FACC ¶¶ 35, 38). Moreover, Urban Air opened its facility roughly 13 miles from the New Jersey Facility approximately two-to-three weeks after the parties closed on the APAs. (*Id.*) (citing FACC ¶ 36). Based on the foregoing allegations, the court finds that Cross-Complainants have sufficiently pled "when" the alleged fraud occurred.

Intent to defraud is also sufficiently pled based on Cross-Defendants allegedly "marketed and solicited the sale of the Three Facilities as a 'bundled' transaction (*id.* at 23) (citing FACC ¶ 21); "all parties in the transactions . . . were buying the Three Facilities because of [Cross-Defendant] Adams as a 'bundle'" (*id.*) (citing FACC ¶ 22); the common multiplier for the Three Facilities as a "bundled" acquisition was determined based upon Adams's and Bynum's disclosures—both individually and on

---

[8] The court rejects Cross-Defendants' argument that the Bakersfield APA does not contain disclosure requirements relating to the New Jersey Facility for reasons discussed in Section A.1. of this Order.

Rush Air's behalf—relating to all Three Facilities' past and expected performances (*id.*) (citing FACC ¶ 24); "This disclosure was important as the New Jersey Facility was the biggest facility of the Three Facilities and was the driving force behind what [Cross-Complainants] would be willing to use as a denominator of EBIDTA for the purchase price of the Three Facilities" (*id.*); "Rush Air, Bynum, and Adams knew that the New Jersey Facility, and its expected future performance, was integral to the acquisition of the Three Facilities as a bundled transaction (*id.*) (citing FACC ¶ 38); and Adams's contract was never disclosed during the parties' due diligence or negotiations for the Three Facilities' common denominator (*id.*).

Cross-Complainants have also sufficiently pled justifiable reliance where the FACC alleges Rush Air, Adams, and Bynum made various material and critical warranties and representations regarding the Three Facilities.  (*Id.*) (citing FACC ¶¶ 26, 29).  Nothing in Cross-Defendants' filings suggests that Cross-Complainants had reason to know during their negotiations of Adams's or Fun Spot's agreement with Altitude or of Urban Air's business inquiry with Adams and Fun Spot in March or April 2017.

Cross-Complainants sufficiently pled damages where they allege that they would not have entered into any of the APAs had they known competing facilities would open nearby the New Jersey Facility, or at the very least, they would have negotiated a much lesser EBITDA multiple for the Three Facilities.  (*Id.*) (citing FACC ¶¶ 44–45).  Cross-Complainants further allege that "the unexpected presence of these competitors (and their active and aggressive competition) 'has affected the historical operation' of the New Jersey Facility and will 'adversely affect' in the future 'all or any portion' of the business of the New Jersey Facility" where the New Jersey Facility will not be able to perform "in a manner consistent with its historical practices and performance."  (FACC ¶ 43) (quoting Bakersfield APA § 3.26).

The court finds that Cross-Complainants have sufficiently pled Adams and Rush Air had "knowledge of the falsity," but have not done so as to Bynum.  The FACC's allegations plausibly demonstrate that Adams and Rush Air (through Adams as Waylaid's manager), had knowledge of the opening of competing facilities within 25 miles of the New Jersey Facility as early as March or April 2017, but failed to disclose that information during the parties' due diligence in summer 2017.  (*See id.*; FACC ¶¶ 39–40.)  The allegations fail to explain, however, how Adams's and Rush Air's knowledge of

1   the opening of Altitude's or Urban Air's facilities may be imputed to Bynum.  Accordingly, the motion

2   to dismiss will be DENIED as to Rush Air and Adams.  However, the motion to dismiss will be

3   GRANTED as to Bynum with leave to amend also being granted.

4               a.  *Cross-Complainants Park, Shiring, and Silverman*

5           Cross-Defendants argue the term "Buying Parties" in the FACC is limited to only RDJ and

6   Flight Fit N Fun.  (Doc. No. 43-1 at 19.)  Cross-Defendants argue that because "Park[], Silverman, and

7   Shiring are not alleged recipients and they have not pled reliance or damages, the fraud cause of action

8   fails to allege facts supporting each element necessary for them to state a cause of action . . . ."  (*Id.*)  It

9   is unclear what Cross-Defendants mean by "alleged recipients."

10          As part of the Bakersfield APA, Park, Shiring, and Silverman signed as Guarantors from RDJ in

11  favor of Rush Air.  (Doc. No. 40-1 at 71.)  Indeed, the court previously held that Park, Silverman, and

12  Shiring are guarantors to whom indemnity may be later available under § 7.2(a)–(b) of the Bakersfield

13  APA.  (Doc. No. 39 at 22–24.)  However, Cross-Complainants write in a footnote:

14
15              If the Court determines that Count Four does not sufficiently allege that
                fraud was committed as to Cross-Plaintiffs Park, Shiring, and Silverman
16              because they weren't individual[ly] identified as the 'Buying Parties' in
                the Bakersfield APA, then Cross-Plaintiffs ask for leave to amend the
17              Counter and Cross-Complaint to further address their individual roles in
                the negotiation and execution of the Bakersfield APA—which includes the
18              fact that each of them were induced to individually sign personal
                Guarantees in connection with the Bakersfield APA as a result of Cross-
19              Defendants' intentional omission of material facts related to the bundled
20              transaction.

21  (Doc. No. 47 at 23 n.4.)

22          While the court acknowledges Park, Shiring, and Silverman's roles as guarantors for purposes of

23  the indemnification clause, their fraud allegations are not pled with the specificity required under Rule

24  9(b).  To the extent Cross-Complainants elect to amend their counter and cross-complaint, they are

25  directed to clarify Park, Shiring, and Silverman's roles in the negotiation process and any alleged

26  inducement into signing the guarantees in connection with the Bakersfield APA.

27  /////

28  /////

### 4. Declaratory Relief

Rush Air contends that the court must dismiss Cross-Complainants' claim for declaratory relief because the court lacks subject matter jurisdiction. (Doc. No. 43 at 20–21.) The court agrees that the parties have not presented federal questions. Rush Air argues that there is no diversity jurisdiction because "there are California entities on both sides of the action." (*Id.* at 20.) In particular, Rush Air contends that Flight Fit N Fun's "principal place of business" is its corporate headquarters, and Rush Air and Bynum are California citizens. (*See id.* at 20–21.) Lastly, Rush Air argues supplemental jurisdiction does not apply here because it is a standalone claim that cannot survive without Cross-Complainants' breach of contract claims. (*See* Doc. No. 52 at 8.)

Diversity jurisdiction requires that the matter in controversy exceeds $75,000 and is between citizens of different states. 28 U.S.C. § 1332(a)(1). On February 6, 2019, Cross-Defendant Rush Air, a California LLC,[9] filed the original complaint in the Kern County Superior Court against Defendants RDJ, a Virginia LLC[10]; Park, a Pennsylvania citizen; Shiring, a Virginia citizen; and Silverman, a Virginia citizen. (Doc. No. 2-1 at 3.) The amount in controversy is $413,377.91. (*Id.* at 6.) On March 25, 2019, Defendants removed the instant action to this federal court under 28 U.S.C. § 1332(a)(1). (Doc. No. 2 ¶ 7.) The court finds that the amount-in-controversy in the original complaint exceeds $75,000. The original complaint is between citizens of different states, which includes California and Georgia citizens on one side, and Virginia, Delaware, and Pennsylvania citizens on the other. Accordingly, the requirements for diversity jurisdiction are satisfied.[11]

/////

---

[9] It appears that all but one of Rush Air's members are citizens of California. (Doc. No. 2 ¶ 9.) The remaining member, Waylaid, is a Georgia limited liability company. (Bakersfield APA at 6.) The filings do not contain any additional information regarding the members of Waylaid other than Adams, who is a Georgia citizen. (Doc. No. 40 ¶ 9.)

[10] RDJ's members are citizens of Virginia and Pennsylvania. (Doc. No. 2 ¶ 10.)

[11] Rush Air argues that there is no diversity jurisdiction because Cross-Complainant Flight Fit N Fun LLC (Bakersfield) is a California citizen. The court need not address Rush Air's argument because diversity jurisdiction exists in the original complaint. "[C]ross-claims do not defeat diversity." *McDaniel v. Loya*, 304 F.R.D. 617, 638 (D.N.M. 2015). The court exercises supplemental jurisdiction for reasons set forth in this Order.

Title 28 U.S.C. § 2201 provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Title 28 U.S.C. § 1367(a) provides:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder of intervention of additional parties.

In the original complaint, Rush Air sought to enforce a promissory note and personal guarantees executed as part of the Bakersfield APA. (Doc. No. 2-1 ¶¶ 9–19.) Given that the FACC concerns breaches relating to the Bakersfield APA, and Cross-Complainants' declaratory relief claim seeks, in part, a "[j]udgment declaring and adjudging that the Note and the Guaranty are null and void and are rescinded" (Doc. No. 40 at 17), the court finds the claims in the FACC are "so related to the claims" in the original complaint such "that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Accordingly, Rush Air's motion to dismiss will be DENIED.

## CONCLUSION

For the reasons set forth above:

1. Cross-Defendants' motion to dismiss under Rule 12(b)(3) for improper venue is DENIED (Doc. No. 43);

2. Adams's motion to dismiss under Rule 12(b)(6) for the breach of the Bakersfield APA is DENIED (Doc. No. 43);

3. Adams's motion to dismiss the breach of the covenant of good faith and fair dealing claim is DENIED (Doc. No. 43);

4. Cross-Defendants' motion to dismiss the unjust enrichment claim is GRANTED with leave to amend (Doc. No. 43);

5. Rush Air and Adams's motion to dismiss the fraudulent inducement claim is DENIED (Doc. No. 43);

6. Bynum's motion to dismiss the fraudulent inducement claim is GRANTED with leave to amend (Doc. No. 43);

7. Cross-Defendants' motion to dismiss Park, Shiring, and Silverman's fraudulent inducement claims is GRANTED with leave to amend (Doc. No. 43); and

8. Rush Air's motion to dismiss the declaratory relief claim is DENIED (Doc. No. 43).

Based on the aforementioned reasons, Cross-Defendants' motion to strike (Doc. No. 42) and motion for more definite statement (Doc. No. 41) are DENIED AS MOOT. Cross-Complainants have 30 days to file amended pleadings or file a notice informing the court that they will not amend.

IT IS SO ORDERED.

Dated: __**February 14, 2020**__ _____

UNITED STATES DISTRICT JUDGE